### APPEAL OF THOMAS THORKILDSEN.

Docket No. 385. Submitted July 20, 1925. Decided September 9, 1925.

A loss sustained on shares of stock which became worthless during 1919 was properly deducted in that year.

*Theodore Martin* and *Lloyd W. Moultrie, Esqs.,* for the taxpayer.
*A. Calder Mackay, Esq.,* for the Commissioner.

Before GRAUPNER, TRAMMELL, and PHILLIPS.

This appeal involves a deficiency in income tax for the year 1919 in the amount of $37,018.22. No hearings were had in the Bureau of Internal Revenue and the contentions herein made by the taxpayer were never brought before the Commissioner for his consideration.

### FINDINGS OF FACT.

1. The taxpayer is a resident of the City of Los Angeles, State of California, and for more than 25 years has been engaged in the business of mining.

2. During the latter part of 1917, Franklin K. Lane, then Secretary of the Department of the Interior of the United States, requested the taxpayer to undertake the production of manganese which was then greatly needed by the Government and fabricators of steel for the manufacture of manganese steel for war uses. This request contemplated the taxpayer's engaging in the production of manganese ore at his own expense and taking such profit or loss

as might result from the undertaking. The taxpayer assented to the request of the Secretary of the Interior and undertook the production of manganese ore on properties located near Las Vegas, Nev., and at Aquila, Ariz.

3. On April 17, 1918, the taxpayer purchased the entire capital stock, or 500,000 shares, of the Manganese Association, Inc., a Nevada corporation, and paid therefor the sum of $88,500. This corporation held leases for a three-year term on four lode claims located in Clark County, Nev., and known as "Three Kids," "Las Vegas," "Las Vegas Extension No. 1," and "Las Vegas Extension No. 2," which contained a very high grade of manganese ore. These lode claims were mining locations and not patented property. In addition to the capital stock of the Manganese Association, the taxpayer acquired from the vendors thereof, by quitclaim deed and for the same consideration, the entire interest in other adjacent manganese mining claims, known as "Three Kids Annex," "Wedge," "Connor Fraction," "Manganese," "Manganese Annex," and "Manganese Extension," and also an undivided three-quarters interest in the "Annex No. 1 " and "Annex " lode mining claims, and an undivided two-thirds interest in the " Big Lode Fraction " mining claim. None of these claims were patented.

4. On April 19, 1918, the taxpayer purchased three additional manganese lode mining claims, known as "Rabbit," "Sunny Jim," and "Uncle Sam," for the sum of $3,000. These claims were unpatented and were situated in Clark County, Nev., close to the mining claims described in the preceding paragraph. On the same day he acquired the outstanding undivided one-third interest in the "Big Lode Fraction " mining claim.

5. On April 29, 1918, the taxpayer purchased seven other lode manganese mining claims, known as the "Johnson No. 1," "Johnson No. 2," "Johnson No. 3," "Johnson No. 4," "Johnson No. 5," "Johnson No. 6," and "Johnson No. 7," for the sum of $1,200. These claims were unpatented and were situated in Clark County, Nev., near to the other mining claims which the taxpayer had previously acquired.

6. During the month of May, 1918, the taxpayer paid the sum of $30,000 to the owners of the four manganese lode claims, known as "Three Kids," "Las Vegas," "Las Vegas Extension No. 1," and "Las Vegas Extension No. 2," for an option to purchase and as a part of the purchase price on said claims. These were the claims upon which leases had been made and assigned to the Manganese Association and which constituted the sole mining rights of that corporation when the taxpayer acquired all of the capital stock

thereof. This option was taken and paid for to avoid a controversy over methods of mining which threatened to result in the cancellation of the lease, and the terms of the option required a second payment in November of 1918. The second payment was not made.

7. Immediately following the purchase of the entire issue of the capital stock of the Manganese Association on April 17, 1918, the taxpayer began operations on the property leased by the corporation and all the properties purchased by him, and continued to mine and ship ore from the claims named above until the 15th of November, 1918, at which date the steel companies refused to purchase any more manganese ore. Between these dates the taxpayer mined and shipped 9,007.23 long tons of manganese ore. After the shipment of ore ceased the taxpayer continued to work 8 or 10 men on the properties in doing assessment work on some of the claims and dismantling and salvaging the mining machinery and equipment. All work ceased and the properties were vacated by the latter part of February, 1919.

8. From the time that the taxpayer acquired all of the capital stock of the Manganese Association he disregarded the corporate entity and existence in all fiscal matters. Some ore was shipped in the name of the Association, but no meetings of directors were held, no corporate office was set up, and no corporate bank account was opened. The claims held by the Association under lease and on which the taxpayer had an option to purchase were worked in conjunction with the claims acquired in his individual name as his individual enterprise. All of the claims that were sufficiently high grade to work were operated at the same time; the ore therefrom was mingled; the costs of mining and shipping ore therefrom to the railroad were expended from the same general fund and not segregated to the separate claims or groups of claims when expended; the contracts for work, equipment, and supplies were made in the taxpayer's name, and the receipts from the sales of ore were placed in the taxpayer's personal bank account. Moneys for the operation of the properties were deposited by the taxpayer in his own name in the First State Bank of Las Vegas, Nev., and drawn upon by his superintendent by checks signed "Thomas Thorkildsen, by L. D. Osborne." Moneys received from the sale of ore were deposited to the taxpayer's personal account in his bank at Los Angeles, Calif. Where the checks were made payable to the Manganese Association they were endorsed by the taxpayer's secretary, who was not an officer or employee of the Association, and deposited to the taxpayer's personal bank account in Los Angeles.

9. The expenditures and receipts of the taxpayer from April 16, 1918, to May 25, 1919, when the last of the accounts of the Las Vegas venture was paid, were as follows:

Expenditures:

| | | |
|---|---:|---:|
| Cost of entire issue of capital stock of Manganese Association and 20 mining claims | | $122,700.00 |
| Mine equipment | $1,378.40 | |
| Camp equipment | 1,130.49 | |
| Administration | 1,073.05 | |
| Mine supplies | 8,222.43 | |
| Camp supplies | 15,058.96 | |
| Expenses of administration | 5,961.35 | |
| Hauling ore (trucking) | 49,181.28 | |
| Pay roll | 52,854.17 | |
| Sales commission | 6,107.37 | |
| Royalties | 7,592.89 | |
| Dismantling | 175.00 | |
| Auditing | 310.00 | |
| Interest | 186.38 | |
| Attorney's fees | 677.18 | |
| | | 149,908.95 |
| Total | | 272,608.95 |

Receipts:

| | | |
|---|---:|---:|
| Boarding house | 12,631.97 | |
| Commissary | 1,625.83 | |
| Refund on prospecting account | 20.00 | |
| Refund on laboratory account | 7.44 | |
| Sales of equipment and supplies | 2,802.85 | |
| Equipment on hand | 834.27 | |
| | | 17,922.36 |
| Ore sales | | 184,953.81 |
| Total receipts | | 202,876.17 |
| Total expenditures | | 272,608.95 |
| Total receipts | | 202,876.17 |
| Net loss | | 69,732.78 |

The taxpayer claimed a loss of $70,857.20 and set up this amount as a deduction in his income-tax return for the year 1919. The whole amount was disallowed by the Commissioner.

10. With the signing of the Armistice on November 11, 1918, the intense manufacture of articles and materials for war purposes ceased and by February 1, 1919, it was apparent that the demand for, and opportunity for sale of, manganese ore had terminated. The taxpayer therefore determined to abandon the leases held by the Manganese Association and his rights under the option to purchase the four mining claims held by the Association under lease and, also, all of the claims purchased by him. In accord with this determination he made no further payments on account of his options to purchase the four mining claims leased to the Manganese Association, ordered all work to cease on all of the mining claims, and proceeded to remove and salvage all mining equipment installed by him on the premises.

11. On April 3, 1919, the owners and lessors of the mining claims known as "Three Kids," "Las Vegas," "Las Vegas Extension No. 1," and "Las Vegas Extension No. 2," served notice on the lessees thereof, the Manganese Association, Inc., the assignee of the lessees, and the taxpayer that the lease was "declared forfeited for noncompliance with the terms of said lease" and that none of said parties had "any interest whatever in and to any of the said mining claims or any part thereof" and had "no right whatever therein or thereto." This notice resulted from the failure of the taxpayer to operate the mining claims in accordance with the terms and requirements of the lease. The taxpayer accepted said notice of forfeiture and made no contest thereof either on his own behalf or that of the Manganese Association. This left the Association without assets or funds. The corporation was formally dissolved in the year 1921.

12. On March 2, 1919, an act of Congress entitled "An act to provide relief in cases of contracts connected with the prosecution of the war, and for other purposes," 40 Stat. 1272, was approved by the President. Section 5 of this Act authorized the Secretary of the Interior to adjust, liquidate, and pay such net losses as had been suffered by any person, firm, or corporation, by reason of producing or preparing to produce manganese and other minerals in compliance with the request of the Department of the Interior and other governmental agencies. The Act, as passed, did not include losses suffered from "acquiring property for producing," such provision having been stricken from the Act during its consideration in the Senate. Shortly after the approval of the above-mentioned Act of Congress, the taxpayer presented to the War Minerals Relief Commission of the Department of the Interior a claim for the losses sustained by him in producing manganese on the aforesaid mining claims near Las Vegas. This claim was formally disallowed by the Commission on March 29, 1920.

13. The properties operated near Aquila were distinct from those described above and consisted of two groups of claims—one known as the Flynn-Gallagher group and the other as the Armour-Pittsburg group, situated, respectively, in the Vulture mining district and the Ellsworth mining district, Maricopa County, Ariz.

14. About February 13, 1918, the taxpayer purchased a lease covering the Flynn-Gallagher group of six claims for a consideration not shown by the evidence and commenced mining operations thereon. About 94 tons of ore were produced from this property and sold for $2,518.10. This property was not developed beyond the prospecting stage and did not contain ore in sufficient quantity to be of commercial importance. The taxpayer discontinued operations on this

property about May 1, 1918, and subleased it to two men who operated it for but a short time thereafter. From such evidence as is before us, apparently, the purchase price of the lease and cost of operations by the taxpayer totaled $3,740.92 and, after deducting the amount of $2,518.10 received from the sale of ore, he suffered a loss of $1,222.82 from his operation of this group of claims.

15. About May 25, 1918, the taxpayer paid $100 for a lease of the mining claims known as the Armour-Pittsburg group. These he had begun to operate about May 1, 1918, and continued to operate until about July 1, 1918, when he entered into an agreement with one B. F. Miller, Jr., whereby Miller was to take over the active supervision of operations, erect a mill and participate thereafter in certain profits of the enterprise. Under this agreement Miller took active control of the property, mined considerable manganese ore, and constructed a mill, which was finished about November 11, 1918, and operated at a loss for two or three months thereafter.

16. From such evidence as we have before us, the following is a summary of expenditures and receipts on the operation of the Armour-Pittsburg group of claims from May 1, 1918, to about January, 1919:

Expenditures:

| | | |
|---|---|---|
| Thorkildsen's operations, May 1 to June 30, 1918, including purchase price of lease | | $3,159.75 |
| Miller's operating expense, July 11 to Nov. 12, 1918 | | 18,148.82 |
| Miscellaneous expense | | 725.33 |
| Machinery purchased | | 5,933.08 |
| Total expenditures | | 27,966.98 |
| Receipts: | | |
| Ore sales | $577.19 | |
| Salvage | 2,373.33 | |
| | | 2,950.42 |
| | | 25,016.56 |

17. Soon after the enactment of the Act of Congress mentioned in paragraph 12 hereof, the taxpayer and Miller presented a claim for compensation of losses to the War Minerals Relief Commission of the Department of the Interior. The proportion of the amount claimed by the taxpayer as his loss was $6,090.93, and he sought allowance thereof as a deduction in his income-tax return for the year 1919. The Commissioner disallowed this deduction. On or about May 5, 1921, the Secretary of the Interior allowed the claim of the taxpayer and Miller in the amount of $19,951.88, and the taxpayer received therefrom as his share $5,485.45. This amount of $5,485.45 was reported by the taxpayer as income in his tax return for the year 1921.

DECISION.

The deficiency should be computed in accordance with the following opinion. Final determination of the Board will be settled on consent or on 15 days' notice.

OPINION.

GRAUPNER: The taxpayer contends that the Commissioner committed error in refusing to allow as losses deductible from income (a) the sum of $70,857.20 which the taxpayer claimed as a loss resulting from mining operations near Las Vegas, Nev., and (b) the sum of $6,090.63 claimed as a loss sustained through mining operations near Aquila, Ariz. The Commissioner asserts that the losses claimed are not deductible items under the provisions of section 214 (a) of the Revenue Act of 1918, because (a) the losses sustained on the Las Vegas operations were not those of the taxpayer but of the Manganese Association, Inc., and (b) that if the taxpayer sustained any losses on the two ventures they were not sustained during the year 1919. The two assigned errors involve such distinctly different conditions that they must be separately discussed.

At the time of the purchase of the 500,000 shares of stock and the mining claims, described in paragraph 3 of the findings of fact, on April 17, 1918, the corporation had no assets, except an assignment of a lease for a period of three years on four mining claims. The corporation owned no machinery or equipment for operating the mines, and it had no funds. The taxpayer disregarded the corporate entity and placed his personal funds directly in the operation of the mining claims. Because the operating funds were used indiscriminately for operating the claims leased to the corporation and the claims owned by the taxpayer without any segregation and because the ore mined from various claims was intermingled without segregation, there is no way in which we can allocate any share of the moneys advanced for operating expense or received from sale of ore to the corporation or to any particular claim. The taxpayer intended the whole project to be his and, because he owned all the corporation's stock, considered all rights of the Manganese Association merged into his individual venture. Whether the stock of the Manganese Association was worthless, when it became worthless, and, if worthless, when the taxpayer was entitled to claim his loss, are the questions which must be decided by the Board.

At no time after the acquisition of the stock by the taxpayer did the Manganese Association have any assets, except the leases to the four mining claims. When the taxpayer abandoned the lease and the lease was declared forfeited on April 3, 1919, the corporation ceased

to do business and to have any assets or claim to any assets. It had nothing with which to do business or to give the stock any worth, and there could be no market for its sale. Therefore, during 1919, the taxpayer was left with certificates representing 500,000 shares which had no value and no market. The stock became worthless during that year, and the taxpayer was entitled to deduct his loss thereon, unless there existed some claim upon which he could recover. *Appeal of Milton H. Bickley*, 1 B. T. A. 544.

The taxpayer filed a claim with the War Minerals Relief Commission during 1919, in which he sought to recover from the Government the loss he had sustained on the Las Vegas property. As the receipt from sales of manganese ore greatly exceeded the cost of mining and producing, his claim for a loss on this venture could only be predicated upon moneys expended for purchases of properties and mining rights. As a matter of fact, his profits from ore sales recompensed the taxpayer for all expenditures for purchasing mining claims and a portion of the cost of the stock of the Manganese Association. Therefore, the taxpayer's only claim for loss rested upon the unrecouped balance of $69,732.78 paid for the stock of the Manganese Association, and this stock was purchased for no other purpose than to use the mining rights of the corporation. His claim against the Government for such a loss was without merit, and there could be no chance of recovery thereon.

Section 5 of the Act of March 2, 1919, authorized the Secretary of the Interior "to adjust, liquidate, and pay such net losses as have been suffered by any person, firm, or corporation, by reason of producing or preparing to produce, either manganese, chrome, pyrites, or tungsten in compliance with the request or demand of the Department of the Interior," etc. On its introduction in Congress, section 5 of the bill contained this further provision: "or acquiring property for producing." This clause was stricken from the bill while it was under consideration in the Senate on January 28, 1919. Senator Smoot objected to the provision in the following language:

> I want to call the attention of the Senator from Nevada to the words "or acquiring property for producing." It seems to me that is going too far. I think that where a man has purchased a piece of property for producing these metals, we should not authorize the Secretary of the Treasury to go into the question as to what he paid and whether he lost upon the purchase price of that property because of the fact that the war closed sooner than he anticipated. I believe that is going altogether too far. I will ask the Senator if it would not be very much better to strike out the words "or acquiring property for producing"?

The chairman of the Senate Committee on Mines and Mining in charge of the bill replied: "I will consent to that, Mr. President." Whereupon, the provision was stricken from the bill. 57 Cong. Rec., Pt. 3, p. 2213.

The taxpayer's claim did not rest upon a loss suffered " by reason of producing or preparing to produce," but upon a loss resulting from "acquiring property for producing." He was without right under the law and therefore should not be prejudiced from deducting his loss when it was sustained in 1919 by the fact that he had filed a claim without merit. He should not be compelled to await a certain adverse decision before claiming his deduction. We are, therefore, of the opinion that the taxpayer is entitled to a deduction for his loss in the amount of $88,500 on the stock in 1919.

What was the purchase price or market value of the nine mining claims named in paragraph 3 of the findings of fact and included in the $88,500 paid for the entire issue of the capital stock of the Association can not be determined from the evidence, but it, as well as the $3,000 paid for the three claims described in paragraph 4 of the findings, and the $1,200 paid for the seven claims described in paragraph 5 of the findings, became a loss immediately upon the execution of the taxpayer's intention to abandon those claims, which he did in February of 1919.

A mining claim may be abandoned, as was said in *Mallet* v. *Uncle Sam Gold and Silver Mining Co.*, 1 Nev. 188, and adopted in *Harkrader* v. *Carroll*, 76 Fed. 474, and *McKay* v. *McDougall*, 64 Pac. 669:

In determining whether one has abandoned his property or rights, the intention is the first and paramount object of inquiry; and there can be no strict abandonment of property without the intention to do so. * * * Abandonment may be completed the very instant the miner leaves his claim, for time is not an essential element of abandonment; the moment the intention to abandon and the relinquishment of possession unite, the abandonment is complete.

The $30,000 paid by the taxpayer in May of 1918 for an option to purchase the four claims under lease to the Association became a loss in 1919 when he abandoned operation of the mines under lease and permitted the lease to be forfeited without intention to purchase the claims. This was the final act of abandonment of his rights to purchase and use the property and the meeting of intention and fact on abandonment. 18 R. C. L. 1167.

Thus the taxpayer's actual loss in 1919 was as follows:

On stock and mining claims purchased as described in finding 3____ $88,500.00
On mining claims purchased as described in finding 4_____ 3,000.00
On mining claims purchased as described in finding 5_____ 1,200.00
On option to purchase described in finding 6_____ 30,000.00

    Total_____ 122,700.00

Whether the taxpayer had any income from the operation of the mines during the month of January and the early part of February, 1919, we can not determine from the evidence at hand, there being no proof and no copy of the income-tax return before us.

Regarding the claim for losses on the Aquila properties, it would appear that those losses were sustained in 1921, at which time final settlement was made with the Government and the losses set at $1,828.30.

ARUNDELL not participating.